Joseph G. SALINGER, Alice R. Salinger, Martin T. Kelinson, Virgil P. Kincaid, and Helen M. Kincaid, Plaintiffs,

v.

PROJECTAVISION, INC., Marvin Maslow, Eugene Dolgoff, Martin J. Holleran, and Howard Ladd, Defendants.

No. 95 Civ. 4862 (JGK).

United States District Court, S.D. New York.

July 25, 1996.

Robert J. Berg, Law Offices of Robert J. Berg & Goldstein Till & Lite, Newark, New Jersey, Carol V. Gilden, Much Shelist Freed Denenberg Amert Bell & Rubenstein, Chicago, Illinois, for plaintiffs.

Mark L. Weyman, Ann S. Ginsberg, Anderson Kill Olick & Oshinsky, P.C., New York City, for defendants Projectavision, Maslow, Holleran, and Ladd.

John J. Gallagher, Adam H. Schuman, Corbin Silverman & Sanseverino, New York City, for defendant Dolgoff.

### OPINION AND ORDER

KOELTL, District Judge.

This is an action for securities fraud based on allegedly false representations and omissions by the defendants in Projectavision, Inc.'s filings with the Securities and Exchange Commission ("SEC") its press re-

leases, and other public statements. Projectavision is a Delaware corporation with its principal place of business in New York City. Projectavision's securities are publicly traded on the over-the-counter market and quoted on the National Association of Securities Dealers Automated Quotation ("NASDAQ") system. Defendants Maslow, Dolgoff, Holleran, and Ladd (the "Individual Defendants") are current or former officers and directors of Projectavision. In the First Amended Complaint, the plaintiffs assert claims against all of the defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. Against the Individual Defendants the plaintiffs also assert a claim for control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Finally, the plaintiffs assert claims for common law fraud and negligent misrepresentation under New York law against all of the defendants. The plaintiffs seek to certify this suit as a class action on behalf of those purchasers of securities of Projectavision who traded between November 2, 1992 and April 7, 1995 (the "Class Period").

The defendants now move to dismiss the First Amended Complaint.[1] The defendants argue that the securities fraud claim under § 10(b) is time-barred and also that it fails to state a claim on which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6), and that the First Amended Complaint fails to plead fraud with particularity pursuant to Fed. R.Civ.P. 9(b). The Individual Defendants also argue that the § 20(a) claim for control person liability fails to state a claim and is improperly pleaded. Finally, the defendants urge the Court to decline supplemental jurisdiction over the two state law claims if the claims under the Exchange Act are dismissed.[2] The plaintiffs resist the motion on

---

1. The defendants are divided into two groups represented by different counsel. Defendants Projectavision, Maslow, Holleran, and Ladd comprise one group, and defendant Dolgoff is the other. Each group has moved to dismiss separately, although the motions overlap to some extent. Defendant Dolgoff's motion is addressed principally to the claims under § 20(a).

2. All of the defendants assert additional arguments directed to the elements of § 10(b) and Rule 10b–5, namely loss causation and reliance, and to various other aspects of the allegations supporting the § 10(b) and Rule 10b–5 claims. In light of the result here, there is no need to reach these additional arguments relating to the § 10(b) and Rule 10b–5 claims or the issue of the

all grounds and seek leave to replead should the Court determine that the First Amended Complaint lacks particularity.

For the reasons that follow the defendants' motions are granted under both Fed.R.Civ.P. 12(b)(6) and 9(b).

## I.

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), the allegations in the complaint are accepted as true, *Cohen v. Koenig*, 25 F.3d 1168, 1172–73 (2d Cir.1994), and all reasonable inferences must be made in the plaintiff's favor. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). Therefore, the motion should be granted only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see Goldman*, 754 F.2d at 1065.

## A.

The First Amended Complaint includes quotes from Projectavision's various SEC filings, including its Form 10–K, 10–Q, and S–3 shelf registration filings. (*See* FAC [3] ¶¶ 46, 48, 56, 57, 65–67, 70, 77.) The First Amended Complaint does not incorporate the SEC filings in their entirety nor are those documents attached as exhibits. Nonetheless, the defendants have submitted complete copies of Projectavision's Form S–1 Registration Statement, Amendments and related Prospectus, Form S–3 Registration Statement, Amendment, and related Prospectus, and Form 10–K's for the years 1992, 1993, and 1994. The defendants cite these documents liberally in their motions to dismiss.

§ 20(a) control person claims against either Dolgoff or any of the other Individual Defendants. The defendants also move to strike certain allegations in the First Amended Complaint pursuant to Fed.R.Civ.P. 12(f). There is also no need to reach this aspect of the defendants' motion.

The plaintiffs have objected to the defendants' submission of documents not referred to or incorporated in the First Amended Complaint such as the Form S–1 Registration Statement, the various Amendments to both the Form S–1 and Form S–3 Registration Statements, and the respective Prospectuses. The plaintiffs argue that the Court may not consider documents neither cited in the complaint nor incorporated by reference. The plaintiffs also argue that some of these documents predate the Class Period. Although it is true that these SEC filings were not referenced in the complaint, they are required public disclosure and therefore properly considered on a motion to dismiss under Fed.R.Civ.P. 12(b)(6). *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773–74 (2d Cir.1991) (text of public disclosure documents filed with SEC may be considered).

The First Amended Complaint also includes myriad references to and direct quotations from press releases, magazine articles, analyst's reports and wire service stories. (*See* FAC ¶¶ 40, 41, 42, 44, 45, 49–55, 58–64, 68, 69, 72–75, 84.) The defendants have supplied the complete text from these sources and the plaintiffs have not objected to the Court's consideration of these submissions. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 808–09 (2d Cir.1996) (district court may consider full text of documents integral to the complaint even where only limited quotations included).

## B.

The facts as alleged in the First Amended Complaint and the relevant provisions of Projectavision's SEC filings are as follows.

Projectavision is a company developing a solid state tubeless projection television system employing a patented depixelization technology and a liquid crystal display. (FAC ¶ 2.) The depixelization technology was developed originally by Dolgoff, (FAC

3. References to "FAC" are to the First Amended Complaint, filed October 2, 1995 in order to consolidate three separate related securities class actions against Projectavision and the Individual Defendants.

¶ 33), and in partnership with Maslow, (FAC ¶ 34), Projectavision was formed in 1988. (FAC ¶ 35.) On July 31, 1990, Dolgóff and Maslow took Projectavision public. (FAC ¶ 37.) Projectavision continued as a development company over the next several years, financing its research and development through further sales of its securities. (FAC ¶ 38.) During 1991 and 1992 the company reported no revenue, (FAC ¶ 38), and during 1993 and 1994 it conducted eleven private securities placements raising over $12 million. (FAC ¶ 38.) During this time, the company sustained mounting losses: $1.6 million in 1991, $2 million in 1992, $2.7 million in 1993, and $5.6 million in 1994. (FAC ¶ 77.)

According to the plaintiffs, the defendants misled the investing public through public announcements and SEC filings in order to prop up the stock price and sustain Projectavision's repeated trips to the capital markets for financing. The alleged misrepresentations and omissions relate principally to the characterizations of certain licensing agreements Projectavision executed beginning in late 1992.

On or about November 2, 1992, Projectavision announced that a major Japanese electronics manufacturer intended to license Projectavision's proprietary depixelization technology. (FAC ¶ 40.) Maslow, now Projectavision's Chief Executive Officer, declared: "We are very excited by these developments. We believe that it affirms the commercial viability of our technology. Most significantly, this event marks our transition from research and product development to the beginning of international distribution and sale of products enhanced by the company's technology." (FAC ¶ 40.) On or about March 1, 1993, Projectavision announced it had agreed to many of the terms of its prospective license agreement, including the amount of royalty payments. (FAC ¶ 41.) Maslow publicly announced the progress towards an agreement, stating in a press release: "This event marks the culmination of our research and product development activity. We are excited about beginning the international sale and distribution of television products utilizing Projectavision's proprietary technology." (FAC ¶ 41.) On March 31, 1993, Projectavision revealed it had signed a patent license with Matsushita Electric Industrial Co., Ltd. ("Matsushita"). Company officials reportedly commented that although the terms of the Matsushita license were confidential, Projectavision expected that "products using [the Projectavision feature] are imminent and Projectavision would be mentioned in Matsushita product literature." (FAC ¶ 44.)

The market price of Projectavision stock nearly doubled from $8¾ per share at the close of trading just prior to the March 1 press release to $16¼ per share on the day the agreement with Matsushita was announced. (FAC ¶ 43.) The market prices of Projectavision's preferred stock and warrants posted similar gains. (FAC ¶ 43.)

In its Form 10–K filing for the period ended December 31, 1992, filed April 15, 1993, Projectavision disclosed the following information about the Matsushita license:

On March 29, 1993, [Projectavision] entered into a patent license agreement with [Matsushita] which granted Matsushita the right to use [Projectavision]'s patented depixelization video projection technology in connection with the manufacturing and marketing of an advanced tubeless consumer television system in the United States.... Upon signing the [license], [Projectavision] received funds from Matsushita in connection with [Projectavision]'s agreement with Matsushita relating to certain matters concerning [Projectavision]'s proprietary technology. The sum received from Matsushita, as well as other terms and conditions of the Matsushita License, are expressly subject to strict confidentiality provisions set forth in the Matsushita License.

(Weyman Aff., Ex. F [Form 10–K 1992] at 8.)

The plaintiffs allege that the Matsushita license was not a genuine marketing breakthrough and did not represent the beginning of the company's transformation from a development company to a producer of projection television systems. In reality, the plaintiffs contend, the agreement was merely a settlement of Matsushita's alleged infringement of Projectavision's patent. Pursuant to the license Matsushita agreed to remove the

infringing technology from its product line and to pay Projectavision a one-time "royalty" of $105,000. While the agreement did include terms governing any future use of Projectavision technology by Matsushita, Matsushita did not intend to act as a licensee. Subsequent SEC filings reported the receipt of the $105,000 payment in 1993, although the plaintiffs complain that Projectavision misrepresented in its quarterly SEC filings that it "*began* receiving revenue for licensing of its technology[,]" knowing the $105,000 was an isolated payment. (FAC ¶ 48.)

The plaintiffs contend that there was "no reasonable basis for [Projectavision] to lead investors and the investment community to believe that this agreement would create exciting revenue potential for Projectavision and to continue to tout the existence of the Matsushita licensing agreement." (FAC ¶ 47.) The plaintiffs assert that research analysts based their positive assessment of the prospects for Projectavision's stock on the potential for royalty income from the Matsushita license, all while under the misimpression that the license represented the company's first genuine marketing relationship rather than the compromise of a patent infringement claim. (*See* FAC ¶¶ 50, 71.)

Through the end of 1994 Projectavision entered into several other license agreements with companies such as CMC Magnetics Corp. of Taiwan, (FAC ¶ 53), Samsung Electronics Co., (FAC ¶ 73), and Alternate Realities Corp. (FAC ¶ 74.) The company also continued its research and development efforts, culminating with the demonstration of a prototype projection television at the Consumer Electronics Show in January 1994. (FAC ¶¶ 59–63.) In mid–1994 Projectavision announced it would unveil two new prototype television projectors at the summer Consumer Electronics Show in Chicago. (FAC ¶ 69.) Another "debut" of Projectavision's depixelization technology in the form of a prototype fifty-inch rear projection television took place at the next Consumer Electronics Show in early 1995. (FAC ¶ 75.)

The plaintiffs allege that the defendants' misrepresentation of the nature and significance of the Matsushita license conveyed the false impression that Projectavision's depixelization technology was "imminently ready for commercial exploitation by major television and electronics manufacturers, and that, as a result, Projectavision would soon be receiving a steady stream of extremely lucrative licensing revenues." (FAC ¶ 76.)

The plaintiffs also allege that Dolgoff, Projectavision's founder, one-time President and chief scientist, corroborates their contention that the company was misrepresenting the state of its product development. On April 7, 1995 Dolgoff filed a lawsuit in New York Supreme Court alleging that he had warned the other directors that "dissemination to the financial community of technical and commercialization assessments was far too optimistic." (FAC ¶ 83.) Dolgoff attached internal Projectavision documents to his complaint in support of his claim that the there were "severe difficulties . . . in developing and marketing [the] technology. . . ." (FAC ¶ 89.) In fact, those same memoranda reveal that Dolgoff himself was blamed for the company's inability to make product advances. (*See* FAC ¶¶ 79–82.)

Additionally, the plaintiffs allege that even Projectavision's other license agreements with CMC Magnetics, Samsung, and Alternate Realities were one-sided in the sense that there were no mandated payments or requirements that the licensee use Projectavision's technology. (FAC ¶ 84.) The plaintiffs maintain that the defendants failed to disclose this aspect of the licenses, leaving the mistaken impression that these transactions would soon generate a steady royalty stream. (FAC ¶ 84.)

The plaintiffs allege that the market price of Projectavision securities dropped precipitously from the first half of 1993 to the present and that the collapse of Projectavision stock was attributable to the defendants' fraud. (*See* FAC ¶¶ 8, 85, 88.)

The foregoing allegations form the basis for the plaintiffs' claims under § 10(b) of the Exchange Act and Rule 10b–5. The plaintiffs' claims against the Individual Defendants under § 20(a) are based on the underlying § 10(b) and Rule 10b–5 violation and the additional allegations of control exerted

by each. (*See* FAC ¶¶ 17–24, 87.) The plaintiffs allege that the Individual Defendants made their fraudulent representations and omissions in order to promote interest in Projectavision's technology, protect their corporate positions and executive compensation, inflate Projectavision's stock price and facilitate further private stock sales, future public securities offerings, and to enhance the value of the Individual Defendants' own portfolios of stock and stock options. (FAC ¶ 25.)

## II.

■ The defendants first argument for dismissal is based on the statute of limitations. "Litigation instituted pursuant to § 10(b) and Rule 10b–5 ... must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991); *see Dodds v. Cigna Secs., Inc.,* 12 F.3d 346, 349 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994). The complaint in this case was filed on June 28, 1995. The defendants argue that the plaintiffs discovered or should have discovered the facts constituting the alleged violation prior to June 27, 1994 and therefore this action is untimely. The plaintiffs argue that they were unaware of the fraud that had been perpetrated upon them until Dolgoff filed his action in state court against Projectavision and certain of its directors and officers on April 7, 1995. The plaintiffs contend that it was only after internal company memoranda attached to the Dolgoff complaint came to light that they were able to determine that the representations about the license agreements and the state of Projectavision's product development were false and misleading. Until that time, the plaintiffs maintain, the defendants concealed the facts underlying the fraud from them.

■ The one-year part of the statute of limitations on § 10(b) and Rule 10b–5 claims begins to run when the plaintiffs have either actual or constructive notice of the alleged fraud. *Dodds,* 12 F.3d at 350; *Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983).

"[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry. Such circumstances are often analogized to 'storm warnings.' " *Dodds,* 12 F.3d at 350 (citations omitted).

■ The question of constructive knowledge and inquiry notice may be one for the trier of fact and therefore ill-suited for determination on a motion to dismiss. *See Vassilatos v. Ceram Tech Int'l, Ltd.,* No. 92 Civ. 4574, 1993 WL 177780, at *4 (S.D.N.Y. May 19, 1993) (dismissal not appropriate where discovery might yield facts to support or refute plaintiffs' constructive knowledge); *Siebert v. Nives,* 871 F.Supp. 110, 116 (D.Conn.1994) (noting that not every case is susceptible to determination of inquiry notice as a matter of law). Nonetheless, the test is an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings and the public disclosures themselves. *Dodds,* 12 F.3d at 352 n. 3 ("Where ... the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers such as the prospectuses and disclosure forms that are integral to the complaint, resolution of the issue on a motion to dismiss is appropriate."); *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.,* 850 F.Supp. 1105, 1132–33 (S.D.N.Y.1993) ("*Integrated I*"); *Lenz v. Associated Inns and Restaurants Co. of America,* 833 F.Supp. 362, 370 & n. 7 (S.D.N.Y.1993); *see also Menowitz v. Brown,* 991 F.2d 36, 42 (2d Cir.1993) (affirming dismissal based on finding that plaintiffs were placed on inquiry notice based on SEC filings). The plaintiffs need not be able to learn the precise details of the fraud, but they must be capable of perceiving the general fraudulent scheme based on the information available to them. *Dodds,* 12 F.3d at 351 ("An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice."); *In re Integrated Resources Real Estate Sec. Litig.,* 815 F.Supp. 620, 637 (S.D.N.Y.1993) ("*Inte-*

*grated II* ") ("[T]he statute is not tolled for a plaintiff's leisurely discovery of the full details of the alleged scheme. Instead, the period runs from the time at which a plaintiff should have discovered the general fraudulent scheme." (citations and internal quotations omitted)). The available facts must establish the probability of fraud, however, and not merely the possibility of fraud. *Lenz,* 833 F.Supp. at 373 & n. 10; *Integrated II,* 815 F.Supp. at 638.

■ The defendants argue that long before June 27, 1994, information appearing in Projectavision's SEC filings and its public announcements was more than sufficient to place a reasonable investor on notice of the existence of the alleged fraud of which the plaintiffs now complain. The defendants divide the plaintiffs' claims of fraud into two basic assertions: (1) Projectavision's products were out of development and ready for production, i.e. that the company was moving out of its development stage; and (2) the licenses, including the Matsushita license, were about to generate a steady stream of royalty income. The alleged misrepresentations concerning the nature of the Matsushita license relate to both assertions.

The defendants correctly observe that Projectavision's SEC filings included consistent and repeated disclosures that the company's technology was still in development.[4] In its Form S-3 Registration Statement, filed on October 19, 1993 in connection with Projectavision's shelf registration of additional securities, the company disclosed that:

The Company's Projector has not yet been manufactured and there is no assurance that the Projector or any other product embodying the Company's patented projection technology will be developed successfully or that, if developed, the Company can arrange to license its technology or arrange for the manufacture of the Projector or any other products in commercial quantities or at reasonable costs.

(Weyman Aff., Ex. G [Form S-3] at 6.) Indeed, the first item disclosed under "Risk Factors" began:

The Company is in the development stage....

As a development-stage company, the Company continues to experience difficulties encountered by any company in the development stage....

(Weyman Aff., Ex. G [Form S-3] at 5-6.) An identical disclosure appeared in the company's amendment to its Form S-3 Registration Statement, filed December 3, 1993, (*see* Weyman Aff., Ex. H [Form S-3, Amendment 1] at 5-6), and the Prospectus associated with the shelf registration, filed December 17, 1993. (*See* Weyman Aff., Ex. I [Prospectus] at 5-6.)

The following disclosures appeared in Projectavision's Form 10-K for 1993 which was filed in March 1994:

The Company has completed substantially all research and development activities in connection with the Projector.... The Company may continue the development of

---

4. The defendants rely in part on SEC filings that predate the alleged misrepresentations in this case, including Projectavision's Form S-1 Registration Statement filed June 3, 1992. The earliest alleged misrepresentation in this case occurred in November 1992, (*see* FAC ¶ 40), and the crucial alleged misrepresentations were made in the first half of 1993 beginning with the two March announcements relating to the Matsushita license, (*see* FAC ¶¶ 41, 44), and the filing of Projectavision's Form 10-Q's for the periods ending March, June, and September 1993 where the $105,000 in royalty income was first reported. (*See* FAC ¶ 48.)

The plaintiffs purchased their Projectavision stock in March, April and May 1993, (FAC ¶¶ 12-15), except for plaintiff Kelinson whose IRA purchased shares in April 1993, sold all of those shares in March 1994, and purchased shares again in June 1994. (FAC ¶ 13.) Putting aside the second Kelinson purchase, the plaintiffs' purchases of Projectavision shares were completed as of May 1993. It would not be proper to consider documents published prior to that time in determining inquiry notice. Accordingly, the Court has not considered any of the information appearing in documents made public prior to May 1993 for purposes of determining inquiry notice. The fact that plaintiff Kelinson made a second purchase in June 1994 does nothing to change this analysis because the defendants' argument is that the plaintiffs were on inquiry notice prior to that purchase, and no additional fraud is pleaded that would support the June 1994 purchases independently.

the Projector and is now engineering a production model.

.　　.　　.　.　　.

The Company is in the development stage.... The Company has substantially completed research and development with respect to the Projector ... although certain engineering refinements are still ongoing, including optimizing picture brightness for a new rear projection system.

(Weyman Aff., Ex. J [Form 10–K for 1993] at 7, 23.) The independent auditors' report attached to the Form 10–K included a cover letter stating "[t]he Company is in the development stage as of December 31, 1993[,]" and a similar statement appeared in the first note to the financial statements. (Weyman Aff., Ex. J [Form 10–K for 1993] at F–2, F–10.)[5]

The consistent and repeated disclosures in Projectavision's SEC filings would have suggested to an investor of ordinary intelligence that a representation that Projectavision was "imminently ready for commercial exploitation by major television and electronics manufacturers," (FAC ¶ 76), was suspect and deserved further inquiry. These disclosures were made repeatedly in public filings including in March 1994 when Projectavision's 1993 Form 10–K was filed. Because the information made available in the SEC filings was sufficient to place an investor of ordinary intelligence on notice that the company was still in its development stage, the one-year statute of limitations would have expired by April 1995, prior to the filing of this suit.

The plaintiffs argue that the statements in the SEC filings were insufficient to place an investor on notice of *probable* fraud, particularly when contrasted against the press releases "stressing the commercial feasibility of Projectavision's technology and the imminent entry of these products into the marketplace." (Pls'. Mem. of L. in Opp'n at 9.) The plaintiffs offer nothing more than con-

clusory argument that the information contained in Projectavision's SEC filings described above was insufficient to constitute inquiry notice. Where the company's public disclosure reveals that a particular representation about a crucial feature of an investment has not materialized, the statute of limitations is triggered. *See Dodds,* 12 F.3d at 351 (explicit warning of illiquidity and riskiness trigger inquiry notice as to earlier promises of liquidity and safety); *Menowitz,* 991 F.2d at 38, 42 (inquiry notice triggered by disclosure of numerous customer complaints where alleged fraud was failure to disclose customers' pending civil actions); *Lenz,* 833 F.Supp. at 374–75 (inquiry notice triggered by tax disclosures reporting continued losses in contrast to promises of profitability); *In re Integrated Resources, Inc.,* 851 F.Supp. 556, 568–69 (S.D.N.Y.1994) (*"Integrated III"*) (speculative nature of investments disclosed in offering materials in direct contradiction to alleged misrepresentation that investments were conservative and safe); *Anisfeld v. Cantor Fitzgerald & Co., Inc.,* 631 F.Supp. 1461, 1465–66 (S.D.N.Y.1986) (financial reports showed far lower occupancy rate and rental revenues than promised; "[a]ny question the plaintiffs might have had concerning the falsity of the 92% occupancy figure quoted at the inception of the project was surely exposed at the time this memorandum was received"); *see also Eckstein v. Balcor Film Investors,* 58 F.3d 1162, 1168 (7th Cir.1995) (where plaintiffs alleged prospectus failed to disclose that only a portion of profits would be received, inquiry notice was triggered by disclosure of that detail in registration statement).

Moreover, the plaintiffs' position that Projectavision continued to announce to the public that its products were imminent is unsupported by the allegations in the complaint. The First Amended Complaint includes two allegations of press reports relating to impending actual manufacture and sale of Pro-

---

**5.** The company's Form 10–K for 1992 contained identical disclosures. That document was filed April 15, 1993 in the midst of the plaintiffs' purchases of stock. Although this document was publicly filed prior to some of the plaintiffs' purchases, it is proper to consider it for purposes of determining inquiry notice because the plaintiffs

themselves allege the 1992 Form 10–K contained an alleged misrepresentation concerning the Matsushita license. (*See* FAC ¶ 46). *See Menowitz,* 991 F.2d at 42 ("[P]laintiffs were placed on inquiry notice of their claims by the very SEC-mandated disclosure documents they rely upon in their complaints.").

jectavision products: Maslow's comment in a November 2, 1992 wire release that the negotiations with Matsushita marked the transition from "research and product development to the beginning of international distribution and sale of products[,]" (FAC ¶ 40), and an unattributed comment by a Projectavision official appearing in Consumer Electronics on April 5, 1993 that "products using feature are imminent." (FAC ¶ 44.) These alleged misrepresentations are flatly contradicted by the numerous disclosures in subsequent SEC filings as described above.

The additional allegedly misleading press reports do not convey any information about the commercial viability of Projectavision's products or the speed with which such products would appear on the market. For example, the plaintiffs allege that Maslow misrepresented the viability of Projectavision's products in a wire service press release on April 15, 1993. But the quote attributed to Maslow merely indicates a belief that the company's "demonstrated ability to invent, patent, identify, acquire, and finance commercially viable technology will facilitate the rapid growth of Projectavision." (FAC ¶ 49.) The plaintiffs' inference that Maslow's comment meant that Projectavision was poised to unveil a marketable product is not a reasonable one based on the statement itself. But even if it were a reasonable inference, and therefore one that the plaintiffs' would be entitled to have drawn in their favor on this motion, there can be no doubt that the plain disclaimers contained in the numerous SEC filings available after this statement appeared would have provided an investor of ordinary intelligence ample reason to suspect that such an inference was wrong.

Many of the remaining alleged misrepresentations relating to the commercial viability of Projectavision's products amount to nothing more than press reports of the various Projectavision prototypes exhibited at trade shows. (*See, e.g.,* FAC ¶¶ 55, 59, 60, 69.) The plaintiffs do not allege that these reports were false or that Projectavision did not present prototypes at the various shows. And even if there were a reasonable inference to be drawn from the statements in these press reports that a saleable product

was imminent, the explicit statements in the company's public disclosures that the company was still in the development stage and was only in the process of engineering a production model provide notice to an investor drawing such an inference that a saleable product was not reasonable. Indeed, in October 1993 Projectavision disclosed that "[t]he Company has produced a demonstration prototype of its television Projector[,]" (Weyman Aff., Ex. G [Form S–3] at 5), but also acknowledged that:

> The Company's Projector has not yet been manufactured and there is no assurance that the Projector or any other product embodying the Company's patented projection technology will be developed successfully or that, if developed, the Company can arrange to license its technology or arrange for the manufacture of the Projector or any other products in commercial quantities or at reasonable costs.

(Weyman Aff., Ex. G [Form S–3] at 6; *see also* Exs. H [Form S–3 Amendment] at 5–6, I [Prospectus] at 5–6 (repeating same information).) Plainly, an investor who believed that the press reports relating to prototypes constituted a representation that a commercial product would be on the market shortly would be under a duty to inquire about the veracity of that representation in light of these disclosures available in many of Projectavision's SEC filings.

■ With respect to the alleged misrepresentations relating to the licenses generally and the Matsushita license in particular, there were similar "storm warnings" that would have dispelled the inference that a steady stream of royalty income was about to begin. Most significantly, the financial statements published by Projectavision reported no royalty income beyond the $105,000 reported for 1993. The Form 10–K for 1992, filed in April 1993, reported that "[t]o date, the Company has not generated any revenues from operations, although on March 29, 1993, the Company entered into the Matsushita license." (Weyman Aff., Ex. F [Form 10–K 1992] at 21.) The company disclosed in late 1993 that:

> The Company has entered into two (2) royalty bearing, non-exclusive patent li-

**1412**

cense agreements with respect to its video projection technology and presently intends to enter into other similar, patent license agreements, *although there can be no assurances that the patent licenses that the Company has entered into will be profitable* or that the Company will be able to enter into additional patent licenses on terms and conditions acceptable to the Company, or at all.

(Weyman Aff., Ex. G [Form S–3] at 6 (emphasis added); *see also* Exs. H [Form S–3 Amendment] at 6, I [Prospectus] at 6.) The Form 10–K for 1993, filed March 31, 1994, reported $105,000 in revenues from licensing agreements. (Weyman·Aff., Ex. J [Form 10–K 1993] at·23, 25, F–11.)

The allegation by the plaintiffs that they believed more revenues would be forthcoming is contradicted directly by the financial results and cautionary language appearing in Projectavision's SEC filings.

The fact that the Matsushita license arose out of a patent infringement dispute was disclosed outright ·on November 22, 1993. A trade magazine reported that "Maslow told us it was discovered that 'Matsushita inadvertently infringed' on Projectavision patent with [a] system it presumably had developed on its own, and when informed of [the] infringement took .out [a] license." (Weyman Aff.App.·Tab 13 [Consumer Electronics] at 1–2.) The article also reported that the license had "yielded no major product." (*Id.*) The plaintiffs themselves cite this very magazine article as the source of alleged misrepresentations about the Projectavision prototype. (*See* FAC ¶ 59.) The article also conspicuously discloses the origins of the Matsushita license, contradicting the plaintiffs' allegations that this information was never disclosed. (*See* FAC ¶ 6, 47,

70.) That disclosure is consistent with the disclosure appearing in Projectavision's 1992 Form 10–K, filed April 15, 1993, that after signing the license, "[Projectavision] received funds from Matsushita in connection with [Projectavision]'s agreement with Matsushita relating to certain matters concerning· [Projectavision]'s proprietary technology." (Weyman Aff., Ex. F [Form 10–K 1992] at 8.)

Therefore, the information available in Projectavision's SEC filings, combined with information reported in the very press reports on· which the plaintiffs rely and the failure of royalty income to develop would place an investor of ordinary intelligence on notice that the investor should inquire about the truthfulness of any representations that the licenses would be extremely lucrative.[6]

Accordingly, there was sufficient information available in Projectavision's SEC filings and certain press releases to put the plaintiffs on inquiry notice and to trigger the one-year statute of limitations. That limitations period would have expired months before the plaintiffs filed this action in June 1995. Therefore, the defendants' motion to dismiss the plaintiffs' § 10(b) and Rule 10b–5 claims as time-barred is granted.

### III.

The plaintiffs also move· to dismiss based on the plaintiffs' failure to plead fraud with particularity. This argument is persuasive and is an alternate basis on which the defendants' motion to dismiss is granted.

### A.

◾ Claims under § 10(b) and Rule 10b–5 for securities fraud are. subject to the requirements of Fed.R.Civ.P. 9(b) which re-

---

6. The plaintiffs argue that even if publicly available information about the license agreements triggered a duty to inquire the statute of limitations would be tolled by the defendants' fraudulent concealment. The plaintiffs allege that the defendants "used the existence of the confidentiality provisions in the licensing agreement as a cloak of secrecy to justify hiding information regarding the true nature of the agreement from· the public." (FAC ¶ 6.)

The plaintiffs have not pleaded the required elements of fraudulent concealment which in-

clude wrongful concealment and reasonable diligence by the plaintiffs. *See Falik v. Parker Duryee Rosoff & Haft*, 869 F.Supp. 228, 232–33 (S.D.N.Y.1994); *In re General Dev. Corp. Bond Litig.*, 800 F.Supp. 1128, 1142 (S.D.N.Y.1992), *aff'd sub nom. Menowitz v. Brown*, 991 F.2d 36 (2d Cir.1993). Moreover, fraudulent concealment must be pleaded in compliance with Fed.· R.Civ.P. 9(b). *See Butala v. Agashiwala*, 916 F.Supp. 314, 319 (S.D.N.Y.1996) (citing cases). The plaintiff has not begun to satisfy these pleading requirements.

quires that the complaint identify (1) the statements alleged to be fraudulent, (2) who made the statements, (3) when and where the statements were allegedly made, and (4) why the statements were fraudulent. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993); *Ross v. Bolton,* 904 F.2d 819, 823 (2d Cir.1990) ("The time, place, and nature of the misrepresentations must be set forth so that the defendant's intent ·to defraud ... under the securities laws is revealed."); *Baxter v. A.R. Baron & Co., Inc.*, No. 94 Civ. 3913, 1995 WL 600720, at \*2 (S.D.N.Y. Oct. 12, 1995).

■ With respect to the details of the allegedly fraudulent misrepresentations, the defendants argue that while the plaintiffs have listed and quoted extensively from many "statements" in the form of press releases and press reports, (*see* FAC ¶¶ 51–75), and the First Amended Complaint adequately identifies where and when those statements appeared, the plaintiffs have not specified with particularity *how* each of .these statements were fraudulent. According to the defendants the plaintiffs merely allege generally in a single paragraph that:

> Defendants' statements during the Class Period, as set forth above, were materially false and misleading because they were designed to and did convey to the investing public the materially false and misleading impression that Projectavision's projection LCD television system technology was imminently ready for commercial exploitation by major television and electronics manufacturers, and that, as a result, Projectavision would soon be receiving a steady stream of extremely lucrative licensing revenues.

(FAC ¶ 76; *see* FAC ¶¶ 77–79, 87.)

The defendants are correct that such a broad allegation does not adequately identify how each of the allegedly fraudulent statements were false or misleading.[7]

**B.**

■ Allegations of securities fraud under § 10(b) and Rule 10b–5 are also subject to Rule 9(b)'s requirements regarding scienter. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995); *Shields v. ·Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127–28 (2d Cir.1994). To plead scienter properly ·a plaintiff must allege facts giving rise to a strong inference of fraudulent intent. The inference may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to . commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of ˙ conscious misbehavior or recklessness." *Shields*, 25 F.3d at 1128; *see In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268–69 (2d Cir.1993), *cert. denied sub. nom Ross v. ZVI Trading Corp. Employees' Money Purchase Pension Plan,* —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994). While Rule. 9(b) only requires that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," this somewhat more relaxed pleading requirement "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations[,]" *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990), in light of Rule 9's purpose of providing defendants with fair notice of the plaintiffs' claims, safeguarding defendants' reputations from· improvident allegations of malfeasance, and protecting defendants against strike suits. *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991).

As the Court of Appeals of the Second Circuit has explained:

> A common method for establishing a strong inference of scienter is to allege facts showing a motive . for· committing fraud and a clear opportunity for doing so. *Where motive is not apparent, it is still possible to plead scienter by identifying . circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.*

*Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987) (emphasis add-

---

7. The principal alleged misrepresentations relating to the Matsushita license and the imminence of a production-model projector are adequately pleaded in this regard, however, as described earlier.

ed) (citations omitted), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989) (in banc).

 The defendants argue that the plaintiffs have not pleaded scienter properly under either approach. As for motive and opportunity, the defendants argue that none of three purported motives suffices to create the strong inference of fraudulent intent necessary to satisfy Rule 9(b).[8] First, the plaintiffs argue that the defendants made their allegedly false statements in order to raise Projectavision's stock price and facilitate additional stock sales thereafter. It is not sufficient, however, to plead scienter by alleging an abstract desire to enable the company to continue to enjoy a high stock price and thereby ease the difficulties of raising of additional capital. Allegations of these interests are not of themselves sufficient allegations from which a strong inference of fraudulent intent may be drawn. *See San Leandro,* 75 F.3d at 814 (desire to maintain successful bond rating not sufficient motive); *Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir.1994) (insufficient allegation of scienter under Rule 9(b) to allege motive because defendant directors had an interest in a successful IPO and secondary public offering).

The plaintiffs also allege that each Individual Defendant was motivated to assure the company had access to additional capital in order to enhance his own corporate stature and was interested in buoying the stock price to increase his executive compensation. It is true that officers and directors typically have part of their compensation linked to the price of the company's shares and will naturally have an interest in a high stock price. The plaintiffs in this case have alleged such a link. (*See, e.g.,* FAC ¶ 25.) But a generalized interest in executive compensation tied to stock price performance is not a sufficient motive for fraud. *Acito,* 47 F.3d at 54 (noting that increased executive compensation resulting from a higher stock price cannot alone pro-

vide a motive for securities fraud or "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions"). Likewise, an unsubstantiated allegation that an executive was motivated to commit fraud in order to maintain the perquisites of corporate rank does not support a strong inference of fraud. *Shields,* 25 F.3d at 1130 ("a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold").

Finally, the plaintiffs allege that each of the Individual Defendants and their families owned shares of Projectavision as well as options to purchase additional shares. (*See* FAC ¶¶ 18–21.) The plaintiffs allege that the Individual Defendants each had a motive to commit fraud in order to boost the value of these personal holdings. (*See, e.g.,* FAC ¶ 25.) An allegation of a defendant's stock ownership may provide a sufficient motive if supported by allegations of the specific circumstances of the sales of such shares giving rise to a strong inference of an intent to deceive the investing public. *Acito,* 47 F.3d at 54; *Shields,* 25 F.3d at 1131. The First Amended Complaint fails to provide any such specifics, the only allegations in this connection being a repetition of the publicly disclosed details of each Individual Defendant's ownership of Projectavision securities appearing in its Form 10–K's. (*See, e.g.,* Weyman Aff., Exs. F [Form 10–K 1992] at 40–42, J [Form 10–K 1993] at 41–43, K [Form 10–K 1994] at 47–49.) There are no allegations of the circumstances of trading in Projectavision securities by any of the Individual Defendants under circumstances that would give rise to the necessary strong inference of fraud.

Therefore, the First Amended Complaint fails to plead scienter under the first approach because the plaintiffs have not alleged facts to show the defendants had a motive to commit fraud in compliance with Rule 9(b). The alternative approach is to plead facts

---

8. The defendants do not seriously dispute that under the circumstances of this case the Individual Defendants had the opportunity to commit fraud in their positions as the highest officials of Projectavision. *See San Leandro,* 75 F.3d at 813

(in suit against company and its directors "[t]here is no doubt that defendants as a group had the opportunity to manipulate the price of [the company's] stock").

constituting strong circumstantial evidence of conscious misbehavior or recklessness from which a strong inference of fraud may be drawn. The plaintiffs have not pleaded scienter under this approach either.

■ The plaintiffs argue that the defendants possessed information about material facts that was inconsistent with the statements made to the plaintiffs and other investors about the license agreements and the progress of Projectavision's product design effort. The plaintiffs cite internal Projectavision documents from the Board of Directors to then-President Dolgoff in which Dolgoff was criticized for poor management skills and for delays in implementing design enhancements. (*See* FAC ¶¶ 79–82.) The plaintiffs also cite the allegations from Dolgoff's complaint in state court characterizing Maslow's assessments of the commercial feasibility Projectavision product as overly optimistic. (*See* FAC ¶ 83.) The plaintiffs argue that the defendants continued to issue their enthusiastic press releases in spite of knowledge that the projector was commercially infeasible. Finally, the plaintiffs argue that the terms of the confidential license agreements suggest that the Individual Defendants were engaged in securities fraud.

None of the plaintiffs allegations suffice to create the strong inference of fraud based on conscious misbehavior or recklessness.[9] The criticism leveled at Dolgoff is not inconsistent with any of the particular alleged misrepresentations because the defendants are not alleged to have made predictions of when a commercially viable production model would be unveiled. Nor do the plaintiffs allege that the defendants published a schedule or expected rollout date. In fact, there is no allegation that the Individual Defendants ever touted Dolgoff's management skills to the public. To the contrary, the internal memoranda reprimanding Dolgoff for delay and mismanagement are wholly consistent with the repeated admonitions appearing in Projectavision's SEC filings, including that "the Company continues to experience difficulties encountered by any company in the development stage...." (Weyman Aff., Ex. G [Form S–3] at 5–6.) Furthermore, the fact that Dolgoff believed Maslow and other directors were being too optimistic in their public assessments of the speed with which a marketable product could be announced is not inconsistent with the cautionary language appearing in the company's public filings: "The Company's Projector *has not yet been manufactured* and *there is no assurance* that the Projector or any other product embodying the Company's patented projection technology will be developed successfully...." (Weyman Aff., Ex. G [Form S–3] at 6 (emphasis added).) It does not follow from Dolgoff's accusations that Maslow and the other Projectavision directors did not sincerely believe the company's future was bright. Company executives are not required to project a gloomy future. *See Rand v. Starter Corp.,* No. 94 Civ. 5325, 1995 WL 322024, at *4 (S.D.N.Y. May 30, 1995) ("Corporations are not required to characterize either possible results or their operations in a pejorative manner merely to cover all the bases should things turn out worse than expected.") Absent firmer evidence of conscious misbehavior, ordinary disagreements among executives about internal company administration does not raise a strong inference of fraud, particularly when there are no allegations that the executives made representations at odds with such typical disagreements. Indeed, "[e]ven if well-pled, allegations of mismanagement are not actionable under section 10(b) of the federal securities laws." *Ciresi v. Citicorp,* 782 F.Supp. 819, 821 (S.D.N.Y. 1991), *aff'd without opinion,* 956 F.2d 1161 (2d Cir.1992).

■ The plaintiffs also argue that the requisite inference of fraud may be gleaned from the undisclosed terms of the license agreements. The Matsushita license, for example, allegedly required only a one-time payment of $105,000 in satisfaction of Projectavision's patent infringement claim. As was true of all of the other license agreements,

---

9. It should also be noted that to the extent the plaintiffs' have failed to plead with particularity how many of the alleged misrepresentations were false, that pleading deficiency is also fatal to their attempt to plead scienter through conscious misbehavior. *See San Leandro,* 75 F.3d at 813.

the Matsushita license required no other payments or commitments and allegedly was a one-sided agreement permitting each licensee to use Projectavision's technology if they wished. The plaintiffs describe these agreements as "adverse," (Pls'. Mem. of L. in Opp'n at 20), and argue that the Individual Defendants' concealment of these features of the license agreements is circumstantial evidence of conscious misbehavior.

The fact that the terms of the license agreements were confidential does not in and of itself imply anything sinister or adverse about them—and the defendants disclosed the fact that the terms of the agreements were confidential. Moreover, knowledge that the agreements imposed no immediate obligations upon the licensees to pay royalties or to put Projectavision's technology into their products is not inconsistent with a belief that the licenses would eventually become profitable. The plaintiffs do not allege that the defendants made any representations that the licenses required minimum royalty payments or imposed commitments on the licensees. In short, the plaintiffs have not identified anything in the license agreements that is inconsistent with the defendants' statements in a way that represents conscious misbehavior of a kind that would support a strong inference of fraud.

The nearest the plaintiffs come to pleading scienter under the conscious misbehavior approach is the allegation that the defendants knew that the payment of $105,000 in royalties from Matsushita was a one-time fee. The plaintiffs also allege that Matsushita removed certain features from its product line to avoid further infringements of Projectavision's patents. Therefore, the plaintiffs argue, the defendants knew Matsushita was unlikely to ever resume using the Projectavision technology and they knew their public statements about the Matsushita license representing a shift from product development to marketing were misleading. The defendants argue that an equally plausible inference to draw would be that Matsushita was more likely to employ Projectavision's technology having done so already, justifying a belief that the Matsushita license would become profitable. In light of the fact that the

plaintiffs have not alleged any specific misrepresentations by the defendants that the Matsushita license would generate minimum royalty payments, the fact that the $105,000 royalty payment was accurately disclosed in Projectavision's financial statements, the fact that Maslow publicly linked the Matsushita license to its alleged prior infringement of a Projectavision patent, and the fact that Projectavision's public SEC filings included frequent caveats about the uncertainty of the future profitability of the license agreements and the developmental stage of the company, it cannot be said that the defendants' knowledge of the origins of the Matsushita license is circumstantial evidence of conscious misbehavior or recklessness from which a strong inference of fraud may be drawn.

Accordingly, the plaintiffs have failed to plead scienter under either of the two approaches permitted for securities fraud claims. Therefore, the defendants' motion to dismiss for failure to plead fraud with particularity pursuant to Fed.R.Civ.P. 9(b) is granted.

**IV.**

The plaintiffs' claims for common law fraud and negligent misrepresentation under New York state law are also dismissed. Because all of the claims arising under federal law are dismissed, the Court declines supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c)(3). *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, ... the state claims should be dismissed as well."); *Block v. First Blood Assoc.,* 988 F.2d 344, 351 (2d Cir.1993) (no abuse of discretion to refuse supplemental jurisdiction over state law claims when federal claims were dismissed before trial).

**V.**

The plaintiffs' seek leave to replead to cure any pleading deficiencies in the First Amended Complaint. It is appropriate to grant the plaintiffs' request because a dismissal based on failure to plead fraud with particularity under Fed.R.Civ.P. 9(b) is ordinarily without prejudice to plaintiff's filing an amended complaint to cure the deficient pleading. *See Acito,* 47 F.3d at 54–55 ("Leave to amend

should be freely granted, especially where dismissal of the complaint [is] based on Rule 9(b)."); *Luce v. Edelstein,* 802 F.2d 49, 56–57 (2d Cir.1986) ("Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend." (citation omitted)).

In this case, both grounds for dismissal of the First Amended Complaint implicate Rule 9(b). With respect to the statute of limitations, the plaintiffs allege fraudulent concealment by the defendants, albeit in a conclusory manner and without complying with Rule 9(b). The other ground for dismissal is Rule 9(b) applied directly to the plaintiffs' § 10(b) claim. With respect to that aspect of the motion, the plaintiffs expressly request leave to replead.

Because both grounds for dismissal in this case implicate Rule 9(b), dismissal of the First Amended Complaint is without prejudice to the plaintiffs' filing an amended complaint curing the pleading deficiencies.

## CONCLUSION

For all of the foregoing reasons, the defendants' motions to dismiss the Amended Complaint are **granted** and the First Amended Complaint is dismissed without prejudice to the plaintiffs' filing a Second Amended Complaint in accordance with the foregoing within thirty (30) days of the date of this Opinion.

**SO ORDERED.**