**Alice Bender KLAUSNER, Plaintiff,**

v.

**Gaspare P. FERRO, Alfred·DiPasqua, H.J. Bottling Co., Inc. and Cantrel & Cochrane, Inc., Defendants.**

No. 81 Civ. 2692.

United States District Court, E.D. New York.

March 22, 1985.

**1190**

Irving Bizar, Bizar & D'Alessandro, New York City, for plaintiff.

Burton I. Manis, Suozzi, English & Cianciulli, P.C., Mineola, N.Y., for defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiff Alice Bender Klausner brings this action alleging violations of § 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j(b), and the rules promulgated thereunder, in connection with the exchange of her shares of stock in H.J. Bottling Co., Inc. ("HJ") for shares of International Telephone and Telegraph Corp. ("ITT") in August 1976. Plaintiff also alleges pendent state law claims against defendants.

Defendants Gaspare P. Ferro and Alfred DiPasqua have moved for summary judgment dismissing plaintiff's federal claim under the 1934 Act. After a thorough examination of the record, and for the reasons set forth below, I find that defend-

ants' motion for summary judgment should be granted. Because plaintiff's federal claim is insufficient, her pendent state claims must fail as well. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

*Facts*

A great many of the facts underlying this action are undisputed by the parties. Defendant HJ was a closely-held New York corporation, organized on September 5, 1968, which maintained its principal place of business in New Jersey. From the date of HJ's incorporation until August 1976, defendant Ferro was the President and defendant DiPasqua was the Vice President of HJ. Both men were also directors of the company.[1] In 1968, Ferro owned 1005 issued and outstanding shares of HJ stock, and DiPasqua owned 525 shares. After HJ shares were issued to third parties in November 1968, the individual defendants owned approximately 70% of the company's issued and outstanding stock. In 1972, Ferro and DiPasqua each purchased 172 shares from HJ stockholders who had expressed a desire to sell those shares. Following those purchases, the individual defendants owned a total of approximately 88% of HJ's issued and outstanding stock.[2]

Meyer Bender, HJ's insurance broker and the father of plaintiff, had purchased ten (10) shares of HJ for his son, Stephen Bender, plaintiff's brother, in 1968. In or about June or July 1973, Meyer Bender and Seymour Graubard, acting as trustees for plaintiff, purchased six (6) shares of HJ stock at a price of $3900, which transaction was arranged by Ferro, DiPasqua and HJ's then attorney, Anthony V. Curto, Jr. The six shares were issued to plaintiff's trust

---

**1.** Defendant HJ, no longer in existence, is a nominal defendant. Defendant Cantrel & Cochrane, Inc. ("C & C") is a company that was related in interest to HJ and whose name appears on some of the HJ documents in this record.

**2.** It is not disputed that defendants borrowed funds from HJ, which funds HJ borrowed from its bank, in order to carry out payment to the HJ shareholders who sold their stock. The

record indicates, however, that the loans were guaranteed by the personal guarantees of Ferro and DiPasqua and that all borrowed funds and interest were repaid by defendants. *See* Ferro Reply Aff. ¶ B(*o*)-(y) and accompanying exhibits.

It is also undisputed that defendants received increases in salaries and certain benefits from HJ, such as bonuses and the eventual use of a company car.

on July 2, 1973, represented by Certificate No. 55.

Additional transactions in HJ stock are relevant to this action. First, in August 1975, a letter signed by Ferro was sent to all HJ shareholders, offering to purchase any outstanding HJ shares for the price of $750 per share. Affidavit of Gaspare P. Ferro ("Ferro Aff."), Exh. 19. Informing the shareholders that dividends were not expected to be declared, the letter stated in pertinent part:

> From time to time you have been offered the opportunity to sell your interest in the company, and again we feel[,] due to the years that have gone by, compelled to offer you an opportunity to dispose of your interest at this time. Therefore, this is an offer to purchase your stock at the price of $750.00 per share.

The expiration date of this offer was September 12, 1975. As a result of this offer, HJ redeemed 66 shares of its outstanding stock, in addition to some 64 shares which the company had redeemed prior to August 1975. Although plaintiff's trustee did not tender any of the trust's shares for redemption, Meyer Bender informed Ferro, in a series of brief notes, that he would be interested in *purchasing* additional shares at $750 per share if they became available. Ferro Aff., Exhs. 20–24.

In addition to the above transaction, HJ's pre-1976 contacts with ITT are relevant to a discussion of this motion. ITT first approached HJ as a potential acquisition in early 1973, prior to the purchase of shares by plaintiff's trustee. In March 1973, ITT concluded that it did not want to acquire HJ. *See* Ferro Aff., Exh. 3. In early 1976, ITT renewed its interest in HJ. *Id.*, Exhs. 4–6. As a result of negotiations between ITT and Ferro and DiPasqua, those parties reached a tentative agreement to exchange all of the issued and outstanding shares of HJ stock for 235,000 shares of ITT stock. A letter of intent was executed on June 24,

1976. Ferro Aff., Exh. 7. At a shareholders' meeting held on July 6, 1976, all of HJ's shareholders gave their authorization for Ferro and DiPasqua to complete negotiations with ITT. As a result, an exchange of shares between HJ and ITT took place on August 13, 1976, pursuant to an Agreement and Plan of Reorganization (the "Agreement"), executed by ITT and all of the shareholders of HJ.[3] At that time, plaintiff's trust exchanged her six shares of HJ stock for 657 shares of ITT Series K Preferred Stock, having a value of approximately $32,850—or roughly 800% over plaintiff's original investment.

In early 1981, plaintiff instituted this action, alleging that Ferro and DiPasqua failed to make certain disclosures prior to the HJ–ITT stock transfer which amounted to fraud upon her within the meaning of § 10(b) of the 1934 Act. In particular, plaintiff alleges that the individual defendants violated that statute and its rules by failing to disclose in connection with the ITT transaction:

(a) The true value of HJ;

(b) The financial results of HJ from which plaintiff could determine said true value;

(c) That the exchange ratio was determined by defendants' arbitrary value attributed to HJ, which value had been impaired by defendants' improper conduct;

(d) That defendants had acquired 344 additional shares of HJ's stock by causing HJ first to borrow money in the amount of $250,000 and then, in turn, borrowing money from HJ;

(e) That defendants had borrowed the said $250,000 from HJ at no interest and then, upon discovery by HJ's auditors, agreed to repay said loan at an interest rate far below that which HJ had to pay for the $250,000;

---

**3.** A draft of the Agreement, with incomplete schedules, was distributed to the HJ shareholders at the July 6, 1976 shareholders' meeting, and is attached to the Ferro Aff. as Exh. 8. The completed executed Agreement is attached to that affidavit as Exh. 11. The letter of intent to HJ shareholders, Exh. 7, and the terms of the Agreement itself, indicate that ITT's offer was for an exchange of its stock for all shares of HJ stock. *See, e.g.,* Agreement, Section 1.1.

(f) That defendants had raised salaries, bonuses and expense accounts for themselves in ever-increasing amounts without approval from the stockholders;

(g) That HJ was to purchase any shares to be tendered pursuant to the offer and that it was unnecessary for HJ to do that since plaintiff was willing to purchase those shares;

(h) Defendants' intention to, and subsequent increases of, their ownership interest in HJ in order to profit substantially from any future proposed acquisition;

(i) Defendants planned to receive employment and consulting agreements as part of HJ's future acquisition;

(j) Other material and necessary facts. Amended Complaint, ¶¶ 22(a)–(j) (in substance). Plaintiff claims that had she or her father been informed of the facts allegedly not disclosed in the documents connected with the ITT transaction, she "would not have consented to the ITT transaction unless defendants either restructured the transaction to reduce their share of that transaction or otherwise repay substantial parts or all of their profits from their misconduct." Opposing Affidavit of Alice Bender Klausner ("Klausner Aff."). Plaintiff concludes: "Thus, I would have received substantially more from the ITT transaction than I did in fact receive." *Id.*

Plaintiff amended her original complaint following my denial of the individual defendants' motion to dismiss for failure to state a claim on May 12, 1983.[4] In the amended complaint, plaintiff seeks as relief an accounting, the imposition of a constructive trust on defendants' profits and $1 million in punitive damages.[5]

*Discussion*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be granted where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Furthermore, "on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried." *Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 9 (2d Cir.1983) (quoting *Heyman v. Commerce & Industry Insurance Co.,* 524 F.2d 1317, 132 (2d Cir.1975)).

In a Rule 56 motion, the party seeking summary judgment has the burden of establishing that no genuine issues of material fact exist. A dispute as to an immaterial fact, however, does not preclude the court from granting summary judgment. 10A C. Wright, A. Miller & Kane, Federal Practice & Procedure, § 2725 at 89 & n. 13 ("Wright & Miller"). A fact is material if it "tends to resolve any of the issues that have been properly raised by the parties." *Id.* at 93.

Additional considerations are relevant to the resolution of a summary judgment motion when, as here, the action is to be tried before a judge and not a jury. A trial should be held "when a dispute over historical facts or inferences raises issues going to the weight or credibility of testimony, [and therefore] the party opposing the motion is entitled to confront and cross-examine witnesses ... and the judge must consider their credibility and demeanor in finding facts." Schwarzer, *Summary Judgment under the Federal Rule: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 476 ("Schwarzer"). However, if the parties do not dispute the material facts of the case but differ only upon ulti-

4. Although plaintiff alleges that defendants now improperly raise some of the same arguments rejected in the May 12, 1983 decision, I find that defendants' arguments here differ significantly from those presented therein. Also, that decision was issued in relation to a motion to dismiss for failure to state a claim, made before the joinder of issue or discovery. The extensive materials yielded in discovery are now present-ed and available to the Court on the instant motion.

5. Plaintiff's brother, Stephen Bender, brought a similar action in state court complaining of many of the alleged breaches of fiduciary duty at issue here. *See, e.g.,* Ferro Aff., Exhs. 25–32. The status of that action is described in the Ferro Aff., ¶¶ 48–59.

mate facts or conclusions, "it is not so clear that a trial serves as useful purpose." *Id.* at 477. In any event, whether the case is to be tried by judge or jury, once the moving party has met its initial burden of disproving the existence of a genuine issue of material fact, it is incumbent upon the party opposing summary judgment to establish that a genuine factual dispute does exist. *See* Rule 56(c).

Section 10 of the 1934 Act, at issue here, provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

An exchange of shares of stock is a securities transaction within the meaning of this section although it is not a "purchase" or "sale" in the usual commercial meaning of those words. *See, e.g., Ingenito v. Bermec Corp.,* 376 F.Supp. 1154, 1180 (S.D.N.Y. 1974).

■ Although § 10(b) must be read "flexibly, not technically and restrictively," *Superintendent of Ins. of State of New York v. Bakers Life & Cas. Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971), the protection of this statute is limited to punishing schemes which are "in connection with" a securities transaction, in that the defendants must use a device "of a sort that would cause reasonable investors to rely thereon and [therefore] cause them to purchase or sell [or exchange] a corporation's securities." *SEC v. Texas Gulf Sulfur Co.,* 401 F.2d 833, 860 (2d Cir.1968) (en

banc), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Only purchasers or sellers (or transferors) of securities have standing to sue for alleged violations of the 1934 Act, *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), because as recently stated by the Second Circuit:

The purpose of § 10(b) and Rule 10b–5 is to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be.

*Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). In order to prevail in a § 10(b) action, therefore, a plaintiff must establish several facts, namely, that (1) in connection with a securities transaction and (2) acting with scienter, the defendant(s) made (3) a material misrepresentation or nondisclosure upon which plaintiff (4) relied and thereby (5) suffered injury. *See, e.g., Bloor v. Carro, Spanbock, Loudin, Rodman & Fass,* 754 F.2d 57 (2d Cir.1985), at 61.

■ It is also well settled that breaches of fiduciary duty, such as the allegedly unlawful acts complained of by plaintiff here, do not alone give rise to liability under § 10(b). Rather, such alleged breaches only create liability if performed with "deception, misrepresentation or nondisclosure" in connection with a securities transaction. *Sante Fe Industries, Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977). Furthermore, any such alleged nondisclosure must have been "material." *Id.* at 474 & n. 14, 97 S.Ct. at 1301 & n. 14.

The definition of "materiality" under the federal securities laws, in relation to a summary judgment motion, has been the subject of much judicial interpretation. In *TSC Industries, Inc. v. Northway,* 426

U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the United States Supreme Court defined that term as follows:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills'* general description of materiality as a requirement that "the defect have a significant *propensity* to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate *is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.* Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly altered the "total mix" of information made available.*

*Id.* at 449, 96 S.Ct. at 2132 (emphasis added), citing *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Despite the apparent subjectivity involved in determining whether a nondisclosure is "material," it does not follow that

> a court can never grant summary judgment on the issue of the materiality of alleged nondisclosures in a securities case because the question of materiality is one of mixed law and fact.... Although a determination of materiality "requires delicate assessment of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him," ... *summary judgment should be granted when "reasonable minds cannot differ on the question of materiality."* ... To deny a defendant in a securities case alleging nondisclosure of mate-

rial facts the benefit of summary judgment procedures would cause a wholly innocent person to incur enormous legal expenses in defending an unmeritorious and frivolous lawsuit at trial.

*Staffin v. Greenberg,* 509 F.Supp. 825, 834–35 (E.D.Pa.1981), *aff'd,* 672 F.2d 1196 (3d Cir.1982) (emphasis added) (citations omitted).

With the above considerations in mind, I now turn to the analysis of whether any of defendants' alleged nondisclosures give rise to genuine issues of material fact that would defeat summary judgment.

1. *Valuation of HJ stock at the time of the HJ–ITT exchange (Amended Complaint, §§ 22(a)–(c)).*

■ Plaintiff challenges the defendants' alleged nondisclosures of the true value of the HJ stock, and of the financial results from which plaintiff could ascertain the true value. Plaintiff also alleges that the defendants failed to disclose that the exchange ratio was arbitrarily determined by defendants—which ratio was impaired by defendants' allegedly improper conduct. In their statement of undisputed facts submitted pursuant to Local Rule 3(g),[6] defendants state that on August 13, 1976, 235,000 shares of ITT stock were exchanged pro rata for 2144 issued and outstanding shares of HJ stock. The value of HJ, based upon a $53.75 per share value of ITT, is stated by defendants to be $12,600,-000. Defendants' 3(g) Statement, ¶ 39. In her opposing 3(g) statement, plaintiff challenges the values set forth in paragraph 39 of defendants' statement, urging that this value "was determined without any consideration of dividends declared by ITT and the value of employment contracts to Ferro and DiPasqua." Plaintiff also states that "the date chosen by defendants of August 13, 1976 is not necessarily the proper date to be selected."

As stated *supra* at 1193, once the moving party has met its initial burden of establishing that there is no genuine issue of

---

**6.** Effective October 26, 1983, prior to the filing and argument of this motion, Local Rule 9(g) was replaced by Rule 3(g), which is identical in substance to the earlier rule.

material fact, the burden shifts to the party opposing the motion to come forward with admissible evidence that demonstrates that there is a triable issue. Defendants rely on *Staffin v. Greenberg, supra,* for the proposition that even if correct, an allegation that defendants failed to state the true value of stock is insufficient to give rise to liability under the federal securities laws. 509 F.Supp. at 837. Plaintiff claims that the rule set out in *Staffin* is inapplicable here, because unlike the defendants in *Staffin,* the defendants here did not submit any facts or figures which have formed the basis for the valuations they suggest.

This allegation, however, does not defeat the principle stated in *Staffin.* In addition, the record reveals that prior to the conclusion of the HJ–ITT exchange, defendants furnished to plaintiff's trustee several years' worth of unaudited balance sheets for HJ. Ferro Aff., Exh. 10. Defendants also invited plaintiff's trustee to review and discuss all of HJ's files. *Id.* Also, the HJ–ITT exchange agreement, *id.,* Exhs. 8 (unexecuted) and 11 (executed), refers to the consolidated balance sheets of HJ, *see* Agreement at sections 3.6 and 7, and includes in schedule A, part II, a valuation of HJ stock and other financial data. In view of the financial data provided, plaintiff cannot be said to have met her burden of controverting the propriety of the values established by defendants, HJ and ITT, much less the genuineness of any issue of fact that would preclude summary judgment on plaintiff's value-related claims.

*2. The individual defendants' purchase of 344 shares of HJ stock and the corporate loan relating to that repurchase (Amended Complaint, ¶ 22(d), (e) and (h))*

██ Plaintiff alleges that the defendants failed to disclose that they improperly purchased additional HJ shares, thereby increasing their potential profit in the event of an acquisition, and improperly caused HJ to loan them funds to make this purchase, while repaying the loan at an interest rate lower than that charged to the corporation.

It is abundantly clear that plaintiff would not have standing to challenge these allegedly improper acts in themselves, as they occurred in 1972, a year before her trust became a shareholder of HJ. Plaintiff asserts, however, that it is not defendants' specific acts which she challenges, but defendants' failure to disclose them in connection with the ITT transaction. It is stretching logic beyond reason, however, to claim that, if correct, these allegedly omitted facts "would have assumed actual significance in the deliberations of the reasonable stockholder," who was deciding whether to approve the ITT transaction. The nondisclosure of the allegedly improper purchase of shares in 1972 could not conceivably be deemed material to the 1976 exchange of shares with ITT. *TSC v. Northway,* 426 U.S. at 449, 96 S.Ct. at 2132, *supra.* It is also stretching the "in connection with" requirement of § 10(b), as well as circumventing the standing requirements, to consider that these alleged nondisclosures were in any way related to the 1976 exchange of shares which transpired some four years after the defendants' allegedly wrongful acts.

*3. Defendants raised their salaries and enjoyed other benefits without shareholder approval (Amended Complaint, ¶ 22(f)).*

██ Plaintiff alleges that defendants' original contract with HJ stipulated a set salary, and that defendants raised their salaries, and granted themselves benefits such as bonuses, expense accounts and the use of company cars, without shareholder approval. Again, plaintiff has attempted to "bootstrap" into a § 10(b) nondisclosure claim what is essentially a claim "of a derivative nature which belongs to the corporation," *Bender v. Ferro,* 86 A.D.2d 12, 13, 448 N.Y.S.2d 666 (1st Dep't 1982) (citation omitted). While defendants' alleged malfeasance may have provided the basis for an independent derivative claim for breach of fiduciary duty, it did not injure

plaintiff directly nor did it relate in any way to plaintiff's decision at a later date to approve of the ITT transaction. Nondisclosure of the alleged misconduct could not then satisfy even the "broadest interpretation of the 'in connection with'" requirement in that the deceptive practices did not even remotely "touch" the exchange of securities. *See Bloor v. Carro, Spanbock, supra,* 754 F.2d at 61 (*citing Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12–13, 92 S.Ct. 165, 168–169, 30 L.Ed.2d 128 (1971).

### 4. HJ's redemption of its own shares was unnecessary because plaintiff was willing to purchase those shares (Amended Complaint, ¶ 22(g)).

██ Plaintiff here complains of defendants alleged improper nondisclosure regarding HJ's 1975 redemption of 66 shares of stock at a price of $750 per share and the redemption of 64 shares prior thereto. In actuality, plaintiff admittedly complains here of her trust's inability to purchase additional shares at that time. Plaintiff alleges that defendants "substantially benefitted from this repurchase by HJ with no out-of-pocket costs to themselves," Plaintiff's 3(g) Statement at ¶ C(12). However, this bald statement does not controvert the individual defendants' contention that their sole individual purchases of HJ stock took place in 1968 and 1972. The HJ–ITT exchange agreement clearly indicates that at the time of the exchange of shares, there were 130 treasury shares of HJ. Ferro Aff., Exh. 11 (Exh. A, Section II). Defendants admit that they benefitted by HJ's redemption of its own stock, but correctly urge that *all* of the HJ shareholders benefitted in proportion to the amount of HJ shares held by them. Plaintiff does not allege how defendants' benefit from the redemption differs in proportion from that received by the other shareholders. It is also worth noting that the redemption took place some months *before* ITT renewed its interest in HJ. Thus, it cannot be said that any alleged nondisclosure regarding HJ's redemption of 130 of its own shares would be material to a reasonable shareholder's decision to agree to exchange his or her shares.

### 5. Defendants' employment and consulting agreements with HJ (Amended Complaint, ¶ 22(i)).

██ Plaintiff's allegation that defendants failed to disclose the existence of future employment and consulting agreements arising from the ITT transaction is the only alleged nondisclosure which is actually related to that transaction. The record itself, however, belies plaintiff's argument. While the draft agreement, Ferro Aff., Exh. 8, indicates no names or figures under the "Employment Agreements" section (Agreement, Exh. A, Section VIII), the comparable section in the executed agreement, signed by plaintiff's trustees and the other HJ shareholders, does indicate the existence of employment contracts with Ferro and DiPasqua. Thus, they were disclosed to the HJ shareholders.

### Conclusion

As discussed above, I find that the alleged nondisclosures complained of by plaintiff are not actionable here for several reasons. For the most part, the alleged nondisclosures are so remote in time and unrelated in nature to the ITT transaction that they cannot be held to be "in connection with" that transaction within the meaning of § 10(b) of the 1934 Act.

██ In addition, plaintiff alleges that had she been aware of the alleged nondisclosures, she would have somehow restructured the ITT transaction or forced the defendants to repay allegedly wrongfully received profits. *See supra* at 1191–1192. Plaintiff has failed to establish by admissible evidence that defendants profitted unlawfully, and she has not established *how* she would or could have engineered a restructuring of the ITT transaction. That plaintiff would have "demanded" a restructuring or other modification is not to say that the transaction would have been so altered. Plaintiff has not shown any reason why ITT would have acceded to plain-

tiff's theoretical demands, or that plaintiff could have affected the ITT transaction in any manner, given the fact that plaintiff held only ½% of HJ's issued and outstanding shares at the time of the transaction. Consequently, plaintiff has failed to show how defendants' alleged nondisclosures caused her to receive a smaller share of the proceeds from the ITT transaction than she otherwise would have realized, or that she could have forced defendants to disgorge allegedly wrongful profits by blocking the ITT deal. Absent such a showing of causation, plaintiff's § 10(b) claim for those injuries must fail. *Bloor v. Carro, Spanbock, supra,* 754 F.2d at 61.

For the reasons set forth above, I find that this is an appropriate case in which summary judgment should be granted in defendants' favor on plaintiff's § 10(b) claim. Because plaintiff's state law claims are pendent to the insufficient federal claim, the complaint is hereby dismissed in its entirety. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).