**ARDUINI/MESSINA PARTNERSHIP, Lawrence Arduini, and Joseph Messina, Plaintiffs,**

v.

**NATIONAL MEDICAL FINANCIAL SERVICES CORP., Douglas R. Colkitt, and Alan H.L. Carr–Locke, Defendants.**

No. 98 Civ. 7690(DC).

United States District Court, S.D. New York.

Sept. 29, 1999.

Berkovich and McMenamin by Paul R. McMenamin, New York, New York, for Plaintiffs.

Wolf, Block, Schorr and Solis–Cohen, LLP by Jay A. Dubow, Andrew J. Lorin, New York, New York, for Defendant National Medical Financial Services Corp. and Specially Appearing for Defendant Douglas R. Colkitt.

## OPINION

CHIN, District Judge.

Plaintiffs Lawrence Arduini ("Arduini"), Joseph Messina ("Messina"), and the Arduini/Messina Partnership (the "Partnership") bring this action against defendants National Medical Financial Services Corporation ("NMFS"), Douglas R. Colkitt ("Colkitt"), and Alan H.L. Carr–Locke ("Carr–Locke") pursuant to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), and Rule 10b–5 promulgated thereunder. Plaintiffs also assert state law fraud claims.

Defendants NMFS and Colkitt move to dismiss plaintiffs' amended complaint for failure to state a claim upon which relief may be granted, failure to allege fraud with requisite particularity, lack of personal jurisdiction as to Colkitt, and improper venue, pursuant to Fed.R.Civ.P. 12(b)(6), 9(b), 12(b)(2) and 12(b)(3).[1] In the alterna-

1. Defendant Carr–Locke has not been served and has not appeared in this action.

tive, NMFS and Colkitt request that this action be transferred to the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1404(a).

The motion to dismiss plaintiffs' § 10(b) and Rule 10b–5 claim is granted because any properly pled claim would be barred by the applicable statute of limitations and also because plaintiffs fail to state a claim upon which relief may be granted. I decline to exercise supplemental jurisdiction over plaintiffs' state law claims; therefore the amended complaint is dismissed in its entirety. As against non-moving defendant Carr–Locke, the amended complaint is dismissed for the reasons stated herein as well as for failure to comply with Fed. R.Civ.P. 4(m). I do not reach defendants' alternative motion to transfer this action.

## BACKGROUND

### A. *The Facts*

Except where otherwise noted, all facts are drawn from plaintiffs' amended complaint. At all relevant times NMFS, a Delaware corporation with its principal place of business in Nevada, was a public company engaged in the business of providing accounting, billing, collection, and accounts receivable management services to various types of medical providers. (Am.Compl.¶¶ 8, 14). Defendant Colkitt is, and at all relevant times was, the chairman and principal shareholder of NMFS. (Am.Compl.¶ 9). Until February 1, 1997, Carr–Locke was the president, chief executive officer and a director of NMFS. Following Carr–Locke's resignation, Colkitt took over the positions of chief executive officer and president of NMFS. (Am. Compl. ¶ 10; Declaration of Andrew Lorin ("Lorin Decl.") Ex. 4, NMFS 1996 10–K).

NMFS's 1996 and 1997 SEC disclosure documents describe an "aggressive acquisition strategy" whereby NMFS acquired the accounts receivable and client contracts of numerous billing and collection companies. (Am.Compl.¶¶ 16–18). These acquisitions were the sole source of NMFS's revenues in 1996 and 1997; ap-proximately half of the revenues were derived from acquisitions of companies "owned by, controlled by, or affiliated with" Colkitt. (Am.Compl.¶¶ 19–20). The market-maker for NMFS's stock was First United Equities Corporation ("First United"), a registered broker-dealer which is not a party to this action. (Am. Compl.¶ 21). The principals of First United are Howard Irving Weinstein ("Weinstein"), Steven Mark Cohen ("Cohen"), and Jonathan Winston ("Winston"), none of whom is a party to this action. (Am. Compl.¶¶ 22–24).

At the suggestion of Weinstein and Cohen, Messina purchased 170,000 shares of NMFS stock between August 26, 1996 and November 27, 1996 and Arduini purchased 85,000 shares of NMFS stock between October 4, 1996 and the end of November 1996. (Am.Compl.¶¶ 35–41). Weinstein "persuaded" both Messina and Arduini to sell their entire positions in NMFS in December 1996. Messina incurred a loss of $150,000 on the sale; Arduini lost $35,000. (Am.Compl.¶¶ 38, 42). During approximately this same time period, and ending January 10, 1997, Colkitt, an NMFS "insider," sold more than 630,000 shares of NMFS stock for consideration in excess of $4,900,000. (Am.Compl.¶¶ 47–48). Plaintiffs do not allege that Colkitt sold this stock at a profit. Rather, plaintiffs allege Colkitt sold the stock as part of a "classic 'pump-and-dump' scheme" through which Colkitt, Carr–Locke and other unnamed insiders "remov[ed] their support of NMFS" by the stock sales. (Am. Compl.¶ 13).

Despite their previous poor fortune with NMFS stock, in January and February of 1997, Messina and Arduini again purchased NMFS stock, this time in the name of the Partnership. (Am.Compl.¶¶ 51–56). Plaintiffs allege that Weinstein and Cohen induced these purchases, a total of 244,900 shares, by representing that NMFS insiders, including Colkitt, had executed a "lockup" agreement under which they would not be permitted to sell their NMFS

shares for a specified period of time, and that NMFS would be making additional acquisitions in 1997. (Am.Compl.¶¶ 51, 55). The Partnership sold its NMFS stock in April 1997, incurring a loss of $1,746,-000. (Am.Compl.¶ 58).

As disclosed in NMFS's third quarter 1997 10–Q, on or about October 1, 1997 all NMFS's contracts with companies owned by, controlled by, or affiliated with Colkitt lapsed and were not renewed. (Am. Compl. ¶ 66; Lorin Decl. Ex. 7 at 10). NMFS restructured its operations effective January 1, 1998. As part of this restructuring, NMFS wrote-off the remainder of its acquired contracts. (Am. Compl.¶ 68). NMFS's total write-off exceeded $10,900,000. (Am.Compl.¶ 69). All of these facts were disclosed in NMFS's 1997 10–K. (Lorin Decl. Ex. 8 at 1, 14, 19). The lapsed contracts were then transferred, without consideration, to other entities Colkitt or Carr–Locke owned, controlled, or were affiliated with. (Am. Compl.¶ 71). NMFS stock is no longer publicly traded and as of February 1999 has no market value. (Am.Compl.¶ 78).

In essence, plaintiffs allege that all defendants engaged in a course of conduct designed to deceive the investing public, including plaintiffs, about NMFS's value by omitting from NMFS's 1996 and 1997 SEC disclosure documents certain material information—namely Colkitt's intention not to renew the contracts that provided NMFS with the bulk of its revenue and instead to transfer those contracts to other Colkitt and Carr–Locke companies without consideration. As a consequence, plaintiffs contend the market price of NMFS stock was artificially inflated and consequently that plaintiffs were induced to purchase NMFS common stock at excessive prices and Colkitt was able to sell his NMFS stock for close to $5,000,000. Plaintiffs further allege that defendant Colkitt, knowing of his intention not to renew the

contracts, "removed his support" from NMFS presumably causing plaintiffs to lose money on their investments.

Plaintiffs contend that NMFS's market-maker, First United, was part of this scheme. Prior to any of plaintiffs' purchases, NMFS loaned First United $5,200,000. (Am. Compl. ¶ 26; Lorin Decl. Ex. 2 at 7, NMFS Form 10–Q, second quarter 1996). First United repaid $2,000,000 of the loan and Colkitt guaranteed the remainder of First United's obligations. First United's obligations were subsequently assigned to Russell Data, Inc., a company controlled by Colkitt. (Am. Compl. ¶ 26; Lorin Decl. Ex. 3 at 7, NMFS Form 10–Q, third quarter 1996). NMFS also paid First United a "finder's fee" of $490,000 in connection with an acquisition NMFS made in March 1997. (Am.Compl.¶ 27). According to plaintiffs, these transactions induced First United to participate in defendants' fraudulent scheme. (Am.Compl.¶¶ 26, 27).

### B. *Prior Proceedings*

Plaintiffs commenced this action on October 29, 1998. Their initial complaint included causes of action for securities and common law fraud, self-dealing, corporate waste, breach of fiduciary duty, conspiracy, and violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 *et. seq.* In response, all defendants (except for Carr–Locke) moved to dismiss the complaint for failure to state a claim, failure to plead fraud with particularity, improper venue, and lack of personal jurisdiction, or in the alternative for transfer of venue.[2]

On February 3, 1999, I held a conference with the attorneys for plaintiffs and moving defendants. I indicated that because I would be inclined to grant leave to replead even if I were to grant the motion to dismiss, I would instead deny defendants' motion without prejudice and allow

---

**2.** The original complaint also named Robert J. Colkitt, EquiMed, Inc., Russell Data, Inc., Robert Horner, Jr. and Eric Robinson as de-

fendants. Each of these defendants joined the original motion to dismiss; none was named in the amended complaint.

plaintiffs to file an amended complaint, taking into account the arguments raised in defendants' motion to dismiss. I specifically cautioned plaintiffs that if defendants were to move to dismiss the amended complaint, and I were to grant the motion, I would deny leave.

Plaintiffs did file an amended complaint. The amended complaint is narrower, asserting only causes of action for securities fraud and common law fraud. The remaining defendants (except for Carr-Locke) have again moved to dismiss on substantially the same grounds as asserted before.

## DISCUSSION
### A. Motion to Dismiss Standard

In reviewing a motion to dismiss, I must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of plaintiffs. *See Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996). A complaint may not be dismissed under Rule 12(b)(6) unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In other words, the issue before the Court on this motion to dismiss "is not whether . . . plaintiff[s] will ultimately prevail but whether the claimant[s are] entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) (citation omitted), *cert. denied*, 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996).

█ As an initial matter, I must determine what documents I may consider in addition to the complaint and documents

attached thereto. The Second Circuit has held that in evaluating a motion to dismiss a securities fraud action, a district court may consider documents required to be publicly filed with the SEC which bear on the adequacy of disclosure. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773–74 (2d Cir.1991); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir.1991); *see also Salinger v. Projectavision, Inc.*, 934 F.Supp. 1402, 1405 (S.D.N.Y.1996). Accordingly, I consider both the allegations contained in plaintiffs' amended complaint and NMFS's publicly filed documents appended to defendants' motion to dismiss.[3]

### B. Securities Exchange Act Violation

Defendants argue that plaintiffs' claim for securities fraud based upon alleged omissions and misrepresentations is time-barred, and in any event, ought to be dismissed for failure to state a claim upon which relief may be granted or failure to comply with Rule 9(b).

#### 1. Statute of Limitations
##### a. Legal Standard

Defendants first argue that plaintiffs' claim for securities fraud is time-barred. Such claims "must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991); *see Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 349 (2d Cir. 1993), *cert. denied*, 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994). Neither side contends that the three year statute of limitations is applicable; thus the issue to be decided is whether plaintiffs were able to discover the facts giving rise to their

---

**3.** These documents include: NMFS's 1996 and 1997 10-Qs and 10-Ks; prospectuses for NMFS common stock dated August 3, 1995 and September 9, 1996 and Forms 4 filed with the SEC for September, October and December 1996 and January 1997. Defendants also annexed to their motion papers a

press release purportedly issued by NMFS September 13, 1996. According to Second Circuit law, however, I may take into account only disclosure documents "required by law to be filed, and actually filed, with the SEC and not [] other forms of disclosure such as press releases." *Kramer*, 937 F.2d at 774.

claim prior to October 29, 1997, one year before they filed the original complaint in this action.

The test for discovery of securities fraud for purposes of triggering the statute of limitations is "when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Dodds,* 12 F.3d at 350. Discovery in this context includes not only actual notice, but also constructive and inquiry notice. A duty to inquire arises "when the circumstances would suggest to an investor of ordinary intelligence the probability that [he or] she has been defrauded." *Id.* The facts must establish the probability, not mere possibility, of fraud. *See Salinger,* 934 F.Supp. at 1409. While the question of inquiry notice may be one for the trier of fact, "when the facts from which knowledge may be imputed are clear from the pleadings and the public disclosures themselves," the question may properly be resolved on a motion to dismiss. *Id.,* at 1408; *see Dodds,* 12 F.3d at 352 n. 3 (issue of constructive knowledge may be resolved at pleading stage); *Menowitz v. Brown,* 991 F.2d 36 (2d Cir.1993) (affirming district court's finding of inquiry notice based on SEC filings).

#### b. *Application*

Defendants deny, of course, that they engaged in any securities fraud but they contend that even if the factual allegations of the amended complaint are assumed to be true, NMFS's SEC disclosures put plaintiffs on inquiry notice of their claims before October 29, 1997. Plaintiffs argue that they were unaware of the fraud that had been perpetrated upon them until November 13, 1997, the date on which NMFS's 1997 third quarter 10–Q disclosed for the first time that NMFS was not renewing its expired contracts with service providers owned or affiliated with Colkitt. But the defendants need not show that plaintiffs were actually aware of the fraud; they need only show that the circumstances should have suggested to plaintiffs the probability that they had been defrauded. They have done that.

Plaintiffs have alleged that NMFS's SEC filings contained a material omission that the "loan" from NMFS to First United was intended to induce First United to participate in defrauding the investing public, including plaintiffs. It is undisputed, however, that NMFS's public filings disclosed the details of the loan from NMFS to First United. In particular, NMFS's 10–Q filed August 13, 1996 disclosed: (1) the fact that First United was the principal market maker in NMFS common stock; (2) the total amount of the loan; (3) the balance remaining on the loan; (4) NMFS's renegotiation of the terms of the loan; and (5) the fact that NMFS's chairman and principal stockholder (Colkitt) agreed to pay NMFS any amount due not paid by First United. (Lorin Decl. Ex. 2 at 7). Furthermore, NMFS's 10–Q filed November 14, 1996 disclosed that the balance of the note, then $3,344,174, had been satisfied through an unsecured note due from Russell Data Services, a corporation owned by Colkitt. (Lorin Decl. Ex. 3 at 7).

The November 14, 1996 disclosure of what amounts to a gift of more than $3,000,000 by NMFS to its market-maker First United—the principals of which directly promoted NMFS's stock to plaintiffs—certainly should have raised a "red flag" for plaintiffs as to the possibility, perhaps even the probability, of fraud. But there was more.

NMFS's 1995 and 1996 common stock prospectuses, third quarter 1996 10–Q, 1996 10–K, and first and second quarter 1997 10–Qs—all publicly filed with the SEC prior to October 29, 1997—contained numerous facts that should have raised additional significant concerns for the investor of ordinary intelligence. Specifically, NMFS's August 3, 1995 prospectus disclosed NMFS's financial dependence on the Colkitt related contracts. It provides in relevant part: "[s]ubstantially all of the Company's net revenues are currently

generated by contracts with entities which are owned or controlled by the Company's Chairman and principal stockholder and, accordingly, the Company's success is dependent upon the continued existence and profitability of such entities." (Lorin Decl. Ex. 9 at 7–8). The September 9, 1996 prospectus contained identical language. (Lorin Decl. Ex. 10 at 6). The prospectuses also disclosed the following: the existing contracts were not negotiated at arm's length; the terms of future contracts would not be negotiated at arm's length; the possibility that the existing contracts would be canceled; and the potential resultant adverse effects on NMFS upon cancellation. (Lorin Decl. Ex. 9 at 7, 8 and Ex. 10 at 6).

In addition, the details of the lockup agreement, the existence of which plaintiffs claim induced them to purchase additional shares of NMFS after their initial losses, were disclosed in NMFS's third quarter 1996 10–Q, filed with the SEC November 14, 1996. This disclosure included the salient fact that the shares could be sold simply by obtaining the prior approval of First United, the very entity to which NMFS and Colkitt had given millions of dollars. (Lorin Decl. Ex. 3 at 9). Moreover, Colkitt's actual stock sales were fully disclosed to the SEC by March 31, 1997. (Lorin Decl. Ex. 12, Forms 4).

Finally, NMFS's 1996 10–K, filed April 15, 1997 (approximately the time of plaintiffs' final sales and accompanying losses), disclosed facts that, under plaintiffs' theory of their case, should have placed them on red alert. The 10–K again disclosed the fact that NMFS's contracts were with companies related to Colkitt. In the same paragraph the disclosure document revealed the contracts' September 30, 1997 expiration date and the possibility that the contracts would not be renewed on the same terms or at all. (Lorin Decl. Ex. 4 at 11).[4] The expiration date and warning were reiterated in NMFS's first and sec-

ond quarter 1997 10–Qs. (Lorin Decl. Ex. 5 at 8; Ex. 6 at 9).

Plaintiffs need not have been aware of all aspects of the fraud being perpetrated to be deemed on inquiry notice. *See Siemens Solar Indus. v. Atlantic Richfield Co.,* No. 93 Civ. 1126, 1994 WL 86368, at *3 (S.D.N.Y. Mar. 16, 1994). The issue, therefore, is not whether the disclosed facts alerted plaintiffs to the existence of the entire fraudulent scheme they allege occurred, but rather whether plaintiffs had notice of facts sufficient to impose upon them a duty to inquire further into the matter. *See Dodds,* 12 F.3d at 352; *Siemens,* 1994 WL 86368, at *3.

Again, plaintiffs' theory is that defendants engaged in a scheme to defraud by paying First United to generate sales while failing to disclose Colkitt's intent not to renew the contracts. Plaintiffs argue in essence that they would not have purchased their NMFS stock had they known the truth. Yet, they knew that defendants, through Colkitt, had made what was essentially a gift of $3,000,000 to First United, that First United was aggressively promoting NMFS stock, that NMFS was dependent on Colkitt's contracts, that the contracts were soon to expire, that Colkitt had sold nearly $5,000,000 in stock, that Colkitt might not renew the contracts, and that if Colkitt did not do so, NMFS's revenues would plummet. I hold that the combination of available facts contained in NMFS's required SEC disclosure documents was more than sufficient to place a reasonable investor on notice of the probability of the alleged fraud of which plaintiffs now complain prior to October 29, 1997. Accordingly, defendants' motion to dismiss plaintiffs' § 10(b) and Rule 10b–5 claims as time-barred is granted.

### 2. *Failure to State a Claim for Securities Fraud*

Even were I to hold that the statute of limitations did not bar plaintiffs' securities

---

4. Although a later portion of NMFS's 10–K states that management expects to renew the contracts, the same sentence cautions that

"no assurances can be made at this time." (Lorin Decl. Ex. 4 at F–15).

fraud claim, I would still grant defendants' motion to dismiss on the alternative basis that plaintiffs fail to state a claim upon which relief may be granted and fail to plead fraud with particularity.

### a. *Elements of Section 10(b) Claim*

■ Section 10(b) of the Exchange Act prohibits the use of "any manipulative or deceptive" practice in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b). To state a cause of action under § 10(b) and Rule 10b–5, plaintiffs must allege that: (1) in connection with a purchase or sale of securities; (2) each defendant, acting with scienter; (3) made a material false representation, or omitted to disclose material information, or engaged in a scheme to defraud; (4) to each plaintiffs' detrimental reliance. *See Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184, 189 (2d Cir.1998); *In re Blech Sec. Litig.*, 961 F.Supp. 569, 580 (S.D.N.Y.1997). Securities fraud allegations under § 10(b) and Rule 10b–5 are subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737, 15 U.S.C. §§ 78u–4(b). Here, plaintiffs have failed to plead the causation element of their § 10(b) claim with the degree of particularity required by Rule 9(b) and the PSLRA.

### b. *Loss Causation*

Defendants contend that the amended complaint fails to state a claim because it fails to properly allege "loss causation." I agree.

■ The causation element of a § 10(b) and Rule 10b–5 claim contains two parts: transaction causation and loss causation. Transaction causation, also known as reliance, *Press v. Chemical Inv. Servs.*, 166 F.3d 529, 539 (2d Cir.1999), is properly pled by the allegation that "but for the defendant's wrongful acts, the plaintiffs would not have entered into the transac-tions that resulted in their losses." *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 171–72 (2d Cir.1999). Plaintiffs may satisfy the element of transaction causation by pleading either direct reliance on misrepresentations or omissions, or indirect reliance through an allegation of "fraud on the market." Fraud on the market theory is used where "requiring proof of direct reliance would effectively preclude recovery under § 10(b)." *In re Towers Financial Corp. Noteholders Litig.*, No. 93 Civ. 0810, 1995 WL 571888, at *21 (S.D.N.Y. Sept. 20, 1995), *report and recommendation adopted by* 936 F.Supp. 126 (S.D.N.Y. 1996).

■ "To show loss causation, the plaintiffs must show that the defendants' misstatements or omissions were 'the reason the transaction[s] turned out to be ... losing one[s].'" *Moore*, 1999 WL 647118, at *5 (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir.1994)). The loss causation requirement is often analogized to the tort concept of proximate cause. *See, e.g. Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1495 (2d Cir.1992); *Vento & Co. of New York, LLC v. Metromedia Fiber Network, Inc.*, No. 97 Civ. 7751, 1999 WL 147732, at *8 (S.D.N.Y. Mar. 18, 1999). The test for loss causation is thus whether the injury suffered was a "foreseeable consequence of the misrepresentation." *Citibank, N.A.*, 968 F.2d at 1495. To establish a claim under § 10(b) and Rule 10b–5, both elements must be pled. *See id.; Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99 Civ. 342, 1999 WL 544708, at *10 (S.D.N.Y. July 27, 1999) (dismissal of § 10(b) claim warranted where amended complaint alleges transaction causation but not loss causation).

■ Here, plaintiffs clearly aver that but for defendants' material misrepresentations and omissions, they would not have invested in NMFS stock.[5] This allegation

---

**5.** It is difficult to ascertain from the amended complaint the exact misrepresentations and omissions plaintiffs allege form the basis of their securities fraud claims. Plaintiffs' mem-

alone is sufficient to plead transaction causation or reliance; plaintiffs need not rely upon their alternative theory of fraud on the market.[6]

The loss causation analysis is more difficult. The amended complaint essentially alleges a scheme by defendants in which NMFS acquired numerous contracts for the purpose of artificially inflating NMFS's economic value. As a result, plaintiffs purportedly purchased NMFS stock at an inflated price. Plaintiffs' initial NMFS purchases occurred between August 1996 and November 1996. They sold these NMFS holdings in December 1996. In January and February 1997, plaintiffs again purchased NMFS stock, and, in April 1997, again sold all their NMFS holdings. Purportedly unbeknownst to plaintiffs at the time of their purchases, the contracts that formed the bulk of NMFS's revenues were due to expire September 30, 1997. Plaintiffs allege that Colkitt, the chairman of NMFS, had no intention of renewing the contracts upon their expiration, a fact he failed to disclose to plaintiffs. Instead, from September 1996 through January 1997, Colkitt sold his NMFS shares presumably while NMFS stock was trading at an inflated price due to the market's misperception of NMFS's worth. Plaintiffs allege that following Colkitt's sales he and Carr–Locke removed their support from NMFS, injuring plaintiffs.

■ Plaintiffs are unable to link their losses to the alleged misrepresentations and omissions or even to the general fraudulent manipulation scheme.[7] Under plaintiffs' theory, NMFS's stock value was artificially inflated by NMFS's aggressive, but temporary, acquisition of contracts. The stock would therefore come down to its "real value" when the alleged fraudulent scheme was fully implemented, that is, when the nonrenewal of the contracts was finally announced. Thus, any drop in NMFS's stock price as a result of the fraud about which plaintiffs complain would not have been felt until November 1997—seven to eleven months after plaintiffs' sales—when NMFS disclosed that its contracts had expired without being re-

orandum of law in opposition to the instant motion points to four material facts allegedly omitted from NMFS's SEC filings relied upon by plaintiffs: (1) the fraudulent motivation behind NMFS's loan and finder's fee payment to its market maker First United; (2) the impending expiration and write-off of all NMFS's contracts, including those not affiliated with, owned, or controlled by Colkitt; (3) defendants' intention at the time of acquisition not to renew NMFS's contracts but rather to shift the contracts without consideration to other entities affiliated with, owned, or controlled by Colkitt and/or Carr–Locke; and (4) the cash flow problems associated with NMFS's acquisitions.

**6.** Defendants argue that plaintiffs may not rely upon fraud on the market theory due to their failure to allege reliance on an open and efficient market. I need not reach the question to decide this motion.

**7.** Plaintiffs seem to contend that by premising their securities fraud claim upon allegations of a scheme to manipulate the market rather than misrepresentations, they have magically cured any pleading defects. Plaintiffs are correct that their pleading requirements are slightly different under the two § 10(b) theories. *See In re Blech Sec. Litigation,* 928 F.Supp. 1279, 1290–91 (S.D.N.Y.1996) (a § 10(b) claim premised on misrepresentations requires allegations of the "time, place, speaker, and sometimes even content of the alleged misrepresentation" whereas a market manipulation claim must assert "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue") (quotations and citations omitted). Assuming without deciding that plaintiffs have adequately pleaded the foregoing allegations for market manipulation, the analysis is unchanged; plaintiffs' failure to plead loss causation is fatal to their claim. *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985) (plaintiff required to plead loss causation where allegation is scheme to defraud rather than misrepresentation); *Baxter v. A.R. Baron & Co.,* 1995 WL 600720, at *6 (S.D.N.Y.1995) (same); *see also Dietrich v. Bauer,* 76 F.Supp.2d 312, 341–42 (S.D.N.Y.1999) (loss causation required).

newed. Stated another way, plaintiffs' December 1996 and April 1997 injuries occurred prior to the collapse of the market manipulation scheme; these injuries could not have been the foreseeable result of the alleged fraud.

[13] Seeming to acknowledge the problem, plaintiffs contend in their opposition brief that they are "tying their actual losses" to the "removal of support of the company" by NMFS insiders Colkitt and Carr–Locke.[8] It is unclear what plaintiffs mean by "removal of support." Plaintiffs appear to be alleging that NMFS's insiders mismanaged the company following Colkitt's sales or otherwise breached their fiduciary duties because they anticipated that NMFS was soon to become a worthless shell. Such allegations might be sufficient to support a derivative claim but they cannot provide the basis for a securities fraud claim. *See Primavera Familienstiftung v. Askin,* No. 95 Civ 8905, 1996 WL 494904, at *15 (S.D.N.Y. Aug. 30, 1996) ("[c]laims based on corporate mismanagement ... that resulted in the diminution of share value belong to the corporation and can only be brought by it"); *Ciresi v. Citicorp,* 782 F.Supp. 819, 821 (S.D.N.Y. 1991) ("[e]ven if well-pled, allegations of mismanagement are not actionable under section 10(b) of the federal securities laws"), *aff'd without opinion,* 956 F.2d 1161 (2d Cir.1992); *Klausner v. Ferro,* 604 F.Supp. 1188, 1193 (E.D.N.Y.1985) ("[i]t is [ ] well-settled that breaches of fiduciary duty ... do not alone give rise to liability under § 10(b)"), *aff'd without opinion,* 788 F.2d 3 (2d Cir.1986).

Because plaintiffs have failed to allege the essential element of loss causation, defendants' motion to dismiss plaintiffs' § 10(b) and Rule 10b–5 claim is granted.

### 3. *Conspiracy to Defraud*

■ Defendants move to dismiss plaintiffs' third cause of action, conspiracy to

defraud, for failure to state a claim as a matter of law. In 1998, the Second Circuit held that the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), foreclosed not only aiding and abetting liability, but also liability based upon conspiracy to violate § 10(b) and Rule 10b–5. *See Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837, 844 (2d Cir.1998). As a result, the only form of § 10(b) liability that remains viable is primary liability. In their brief in opposition to the instant motion, plaintiffs appear to concede, as they must, that they cannot maintain an action for conspiracy to violate § 10(b) in the Second Circuit. Nevertheless, to the extent plaintiffs' complaint can be read to allege a claim for conspiracy to violate § 10(b), that claim is dismissed.

### 4. *"Fraud on the Market" Cause of Action*

The amended complaint contains a cause of action, separate from plaintiffs' § 10(b) claim, entitled "fraud on the market." As noted above, the theory of fraud on the market may be used as a substitute for direct reliance in pursuing a § 10(b) claim.

■ Plaintiffs apparently derive the elements of their supposed cause of action, including purchasing securities that were "not entitled to be marketed" and that "lacked the basic essentials of a marketable security" so that absent fraud they "would never have been issued or marketed at any price" (Am.Compl.¶¶ 90, 94), from the Fifth Circuit case of *Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983), which they cite in their brief. Courts have interpreted *Shores* as setting forth the theory of "fraud created the market." *See, e.g. Ockerman v. May*

---

**8.** Plaintiffs also argue that First United removed its support from NMFS and that the collective removal of support "triggered a col-

lapse of the stock price." (Pl. Mem. at 16). Neither of these allegations is present in the amended complaint.

*Zima & Co.,* 27 F.3d 1151, 1159 (6th Cir. 1994); *Towers,* 1995 WL 571888, at *20. Unlike fraud on the market theory, the Second Circuit has not yet accepted the "fraud created the market" theory. *See Washington Nat'l Ins. Co. of New York v. Morgan Stanley & Co.,* No. 90 Civ. 3342, 1999 WL 461796, at *9 (S.D.N.Y. July 2, 1999) ("[i]t is not established that the theory that fraud created the market is viable in this Circuit"); *see also Towers,* 1995 WL 571888, at *22 ("[c]ourts in the Second Circuit have implicitly rejected the fraud created the market theory"). Where permitted, the doctrine is used by plaintiffs unable to allege a fraud on the market theory of reliance due to the novelty of the security or the undeveloped nature of the market on which the securities at issue are traded. *See Towers,* 1995 WL 571888, at *22.

 I need not decide the issue of whether plaintiffs may assert such a claim in the Second Circuit; even if fraud created the market theory were applicable to NMFS's common stock, the theory would only help plaintiffs allege reliance or transaction causation, not the missing element of loss causation. Accordingly, plaintiffs' second cause of action, incorrectly termed "fraud on the market," is dismissed for failure to state a claim upon which relief may be granted.

## C. State Law Fraud Claims

 In light of the dismissal of plaintiffs' federal cause of action and the early stage of the litigation, I decline to exercise supplemental jurisdiction over plaintiffs' state law fraud claims.[9] *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Martz v. Incorporated Village of Valley Stream,* 22 F.3d 26, 32 (2d Cir.1994). With no

9. The amended complaint asserts causes of action termed "common law fraud," "fraud on the market," and "conspiracy to defraud." It is unclear whether plaintiffs intended the latter two to be causes of action under state

federal claims and apparently no diversity jurisdiction, plaintiffs' common law fraud claims are dismissed without prejudice for lack of subject matter jurisdiction.

## D. Dismissal of Claims Against Non-Moving Defendant Carr–Locke

On August 16, 1999, I ordered plaintiffs to complete service upon defendant Carr–Locke and file proof of that service by September 15, 1999. I also notified plaintiffs that failure to do so would result in dismissal of this case as against defendant Carr–Locke. The deadline for plaintiffs to comply with my order has passed. Accordingly, this action is hereby dismissed as against defendant Carr–Locke for the reasons set forth above and for failure to comply with Rule 4(m) of the Federal Rules of Civil Procedure.

## E. Leave to Replead

By letters dated September 13, 1999 and September 17, 1999, plaintiffs requested leave to amend their amended complaint to assert additional misrepresentations in NMFS's disclosure documents, which plaintiffs allege they have recently discovered. The combination of my prior instruction, the fact that plaintiffs concede that at least a portion of the "new" information was available to the public as of the "summer of 1998," and the fact that plaintiffs have not asserted how these additional misrepresentations proximately caused their losses leads me to deny their request. It is clear that plaintiffs' pleading failures are inherent in their claims. Leave to replead should be denied where, as here, further pleading would be futile. *See In re American Express Co. Shareholder Litig.,* 39 F.3d 395, 402 (2d Cir.1994) (affirming denial of leave to replead where unclear how RICO proximate cause requirement could be alleged); *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 55 (2d Cir.1995).

or federal law. To the extent the amended complaint states viable causes of action for conspiracy and fraud on the market under state law, I decline to exercise jurisdiction over such claims.

## CONCLUSION

For the reasons stated herein, defendants' motion to dismiss the amended complaint is granted. This action is also dismissed as against non-moving defendant Carr–Locke for the reasons set forth herein and for failure to comply with Rule 4(m). The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.